

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. 3-23CR0381-M |
| DAMON HEATH ROBERTS | |

**INFORMATION**

The United States Attorney charges:

At all times material to this Information:

Introduction

1. **Roberts** owned and controlled JDS Labs, LLC ("JDS Labs"), which was located in the Northern District of Texas. JDS Labs purported to offer "no cost" COVID-19 home tests that could be shipped to individuals nationwide.

2. Beginning in or around February 2023 and continuing to at least in or around May 2023, **Roberts** used JDS Labs to engage in an unlawful conspiracy whereby medical providers and other individuals provided **Roberts** with the information of tens of thousands of Medicare beneficiaries, so that JDS Labs could bill Medicare for over-the-counter COVID-19 tests. In exchange, **Roberts** offered to pay and did pay, and the medical providers and individuals solicited and received, illegal kickbacks and bribes based on the amount Medicare reimbursed for the tests.

3. As a result of the illegal kickbacks and bribes, JDS Labs was able to submit nearly $4 million in claims for over-the-counter COVID-19 tests to Medicare. Medicare paid nearly $1.7 million based on those claims.

The Medicare Program

4. The Medicare Program ("Medicare") was a federally funded health insurance program, affecting commerce, that provided benefits to individuals who were 65 years and older and to certain disabled persons. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b) in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

5. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

6. Medicare included coverage under component parts. Medicare Part A was a hospital insurance program that covered beneficiaries for, among other types of care, inpatient care in hospitals and other facilities. Medicare Part B was a medical insurance program that covered doctors' services, outpatient care, diagnostic testing, durable medical equipment, and other medical items and services not covered under Medicare Part A.

7. Laboratories, pharmacies, physicians, nurse practitioners, and other health care providers that furnished items and services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to

submit a Medicare enrollment application, which required providers to certify that they would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

8. Medicare paid for claims only if the items or services were medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented. Medicare would not pay for items or services that were procured through kickbacks and bribes.

### Over-the-Counter COVID-19 Tests

9. Starting on April 4, 2022, and continuing through the duration of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter COVID-19 tests ("OTC COVID-19 tests") at no cost to beneficiaries with Medicare Part B and those with Medicare Advantage plans. This program was intended to ensure Medicare beneficiaries had access to COVID-19 tests they needed to stay safe and healthy during the COVID-19 pandemic. Eligible providers were permitted to distribute to Medicare beneficiaries OTC COVID-19 tests that were approved, authorized, or cleared by the U.S. Food and Drug Administration.

10. Medicare would not pay for more than eight OTC COVID-19 tests, per calendar month, per Medicare beneficiary. Providers could distribute OTC COVID-19 tests only to Medicare beneficiaries who requested them. Providers were required to keep documentation showing a Medicare beneficiary's request for the tests.

## Count One
### Conspiracy to Pay or Offer to Pay Kickbacks for Referrals to a Federal Health Care Program
(Violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(2)))

The United States Attorney realleges and incorporates by reference all preceding paragraphs of this Information as if fully set herein.

11.  Beginning in or around February 2023 and continuing to at least in or around May 2023, in the Northern District of Texas and elsewhere, the defendant, **Damon Heath Roberts**, knowingly and willfully conspired, confederated, and agreed with others known and unknown to the United States Attorney, to commit offenses against the United States, that is violations of Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, for the furnishing of items and services, namely OTC COVID-19 tests, for which payment may be made in whole or in part under a Federal health care program.

### Purpose of the Conspiracy

12.  It was a purpose and object of the conspiracy for **Roberts** and other coconspirators to unlawfully enrich themselves through the payment, solicitation, and receipt of bribes and kickbacks in exchange for referrals of items and services, namely OTC COVID-19 tests, for which payment was made in whole or in part under Medicare, a Federal health care program, as defined by 42 U.S.C. § 1320a-7b(f).

Manner and Means of the Conspiracy

13. The manner and means by which the defendant and his conspirators sought to accomplish the purpose of the conspiracy included, among other things:

14. **Roberts** owned and controlled JDS Labs, which was an enrolled Medicare provider with the ability to provide OTC COVID-19 tests covered by Medicare to Medicare beneficiaries.

15. Beginning in or around February 2023, **Roberts** and his coconspirators, which included medical providers and other individuals with access to patient information, began sharing Medicare beneficiary information so that JDS Labs could bill Medicare for OTC COVID-19 tests. In exchange, **Roberts** offered and paid, and the medical providers and other individuals solicited and received, a kickback or bribe based on the reimbursement from Medicare for OTC COVID-19 tests JDS Labs billed to the beneficiary's Medicare insurance.

16. Throughout the conspiracy, **Roberts's** coconspirators sent patient information for Medicare beneficiaries. The information was typically sent directly from a medical provider's electronic medical record or was provided on Excel spreadsheets. Upon receiving the patient information and verifying the patient was, in fact, covered by Medicare, **Roberts** submitted or caused a claim for OTC COVID-19 tests to be submitted to Medicare.

17. Once Medicare reimbursed JDS Labs for the claim, **Roberts** paid a kickback or bribe to the referring medical provider or individual. **Roberts** kept track of the Medicare payouts and corresponding kickback amounts that were due to each referring medical provider or individual and kept them updated of the same.

18. Because **Roberts** and his coconspirators knew that it violated the Federal Anti-Kickback Statute to pay or offer to pay kickbacks or to solicit or receive the kickbacks, and that any such payments would be subject to heightened scrutiny, **Roberts** and his coconspirators sought to conceal the kickback payments through the use of passthrough arrangements and payments in cash to conceal the true source and recipient of the kickbacks and bribes.

## Overt Acts in Furtherance of the Conspiracy

19. In furtherance of the conspiracy, and to accomplish its object and purposes, **Roberts** and other coconspirators committed and caused to be committed, in the Northern District of Texas and elsewhere, the following overt acts, among others:

20. On April 3, 2023, **Roberts** sent an email to a medical provider stating: "We also got paid on the 50 patients for [a home health agency], so we are making another payment to you today for $1,700 (50 patients x 34). We already shipped their tests to them, but we need phone #s for these 50 patients. Please tell them to send the phone #s asap. And tell them they can send more patients too."

21. On April 3, 2023, **Roberts** made an ACH transfer in the amount of $1,700 from Account Number 9855 to a coconspirator's bank account for payment of a kickback.

22. On April 17, 2023, **Roberts** sent an email to a medical provider calculating kickback amounts owed to certain individuals and advised that $8,296, which was the total amount of kickbacks, would be sent via wire.

23. On April 17, 2023, **Roberts** made an ACH transfer in the amount of $8,296 from Account Number 9855 to a coconspirator's bank account for payment of kickbacks.

24. On May 5, 2023, **Roberts** made an ACH transfer in the amount of $80,000 from Account Number 9855 to a coconspirator's bank account for payment of kickbacks.

All in violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(2)).

Forfeiture Notice
(18 U.S.C. § 982(a)(7))

25.   Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of the offense alleged in Count One, the defendant, **Damon Heath Roberts**, shall forfeit to the United States, any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

26.   The above-referenced property subject to forfeiture includes, but is not limited to, a "money judgment" in the amount of U.S. currency constituting the gross proceeds traceable to the offense.

27.   Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendants:

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

LEIGHA SIMONTON
UNITED STATES ATTORNEY

_____
RENEE M. HUNTER
Assistant United States Attorney
Texas Bar No. 24072942
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Email: Renee.Hunter@usdoj.gov